UNITED STATES DISTRICT COURT

DISTRICT OF OREGON


ROBERT EVANS MAHLER,                                      Case No. 3:23-cv-01833-AR

                          Plaintiff,                                **FINDINGS AND**
                                                                    **RECOMMENDATION**

          v.


STEADY STREAM, INC., MIZUMI
BUFFET, JINDI OU, LUCY CHEN, and
DOES 1-10,

                          Defendants.

_____

**ARMISTEAD, United States Magistrate Judge**

          Plaintiff Robert Evans Mahler, a disabled individual, alleges that he visited defendants'

restaurant Mizumi Buffet in March 2022 and was told to leave because he had his service dog

with him. Defendants are Steady Stream, Inc., an Oregon corporation operating Mizumi Buffet

restaurant under an assumed business name; Jindi Ou, the president of Steady Stream; Lucy

Chen, the owner/operator of Mizumi Buffet; and Does 1-10, who are unidentified servers, cooks,

and other staff who work at Mizumi Buffet. Against all defendants Mahler brings claims alleging

negligence (Claim 1); gross negligence (Claim 2); violations of the Americans with Disabilities

Act (ADA), 42 U.S.C. § 12101 *et seq.* (Claims 3 and 4); and intentional infliction of emotional distress (IIED) (Claim 5).

The court now considers defendants' motion for summary judgment. (Defs.' Mot. Summ. J. (MSJ), ECF No. 41.) Defendants dispute that anyone asked Mahler to leave the restaurant or that his dog is a service animal for purposes of the ADA, and they support their version of the facts with an affidavit from Chen. (*Id.*) Mahler's response to defendants' MSJ relies on his own affidavit in support of his allegations. (Response to MSJ (Resp.), ECF 47.). As explained below, with Mahler's version of events, there are genuine issues of material fact as to his claims for negligence (Claim 1), gross negligence (Claim 2), and ADA failure to accommodate (Claim 4) against Chen, Mizumi Buffet, and Steady Stream. In contrast, the record does not reflect that there are genuine issues of material fact as to the elements of a general discrimination claim under the ADA (Claim 3) or IIED (Claim 5). And because the record lacks evidence that Ou knew of or participated in the incident, Ou is entitled to summary judgment on all claims.

Therefore, defendants' motion for summary judgment should be GRANTED as to all claims against Ou; GRANTED as to the ADA discrimination and IIED claims against Chen, Mizumi Buffet, and Steady Stream; and DENIED as to the claims for negligence, gross negligence, and ADA failure to accommodate against Chen, Mizumi Buffet, and Steady Stream.[1]

\ \ \ \ \

\ \ \ \ \

---

[1]    Defendants request oral argument. The court, however, does not believe that oral argument would help resolve the pending motion. See LR 7-1(d)(1).

**BACKGROUND**

Mahler alleges that he visited Mizumi Buffet in March 2022 and, over objections that he was with a service dog, was told "no dog" by Chen and was asked to leave. (Compl. ¶ 11, ECF No. 1.) Mahler supports his allegations with his own affidavit that he filed in support of his response to defendants' motion for summary judgment. (*See* Affidavit of Robert Mahler (Mahler Aff.), ECF No. 48.)

In his affidavit, Mahler states the following: He suffers from advanced osteo-arthritis, left-sided hemiplegia resulting from a C-3 cervical fracture, vasovagal syncope, and has dual knee implant prosthetics. (*Id*. ¶ 1.) Because of those conditions, Mahler has difficulty bending over and picking items up from the floor. (*Id*. ¶ 5.) To help mitigate the symptoms of his disabilities, Mahler has used a service dog since the mid-1980s, including his current dog whose name is Guliet (pronounced Juliet). (*Id*. ¶¶ 3-4.) When Guliet was a puppy, she completed the beginning manners classes at PetSmart with Mahler; Mahler did the remainder of Guliet's training himself. (*Id.* ¶ 4.) Mahler trained Guliet in tasks that help to mitigate the symptoms of his disabilities— retrieving items and handing them to Mahler so he does not have to bend over. (*Id.* ¶ 5.) Mahler always worked his service dogs in a vest, including Guliet. When Guliet was working, she wore a vest that stated "Ask to Pet" on one side and "Service Dog" on the other. (*Id.* ¶ 9.) At no time has Guliet ever placed her head on a table or counter while Mahler was with her at a restaurant. Had she done so, Mahler would have corrected her behavior immediately. (*Id.* ¶ 11.)

Mahler lives in Silverton, Oregon, and had stopped by Mizumi Buffet to eat on six or seven occasions before March 4, 2022. (*Id.* ¶ 7.) On that date, Mahler entered Mizumi Buffet

restaurant with Guliet, who was wearing her work vest and was on leash. Mahler spoke with an employee about sitting in an otherwise empty area of the restaurant because he did not want Guliet's presence to pose an inconvenience to any staff or customers. After he was seated, Mahler approached the buffet and helped himself to food, holding his plate in one hand and Guliet's leash in the other. At no point did Guliet's head get near the trays of food at the buffet. (*Id*. ¶¶ 12-13.) Before Mahler had a chance to sit down with his food, Chen approached him and said "no dog," and told him that he needed to leave. Mahler handed his plate of food to Chen and followed her to the front of the restaurant. (*Id*. ¶ 14.) Mahler tried to explain to Chen "what the law was," what questions she was allowed to ask, and that she "was required to allow [them] to stay and eat." (*Id*.) Chen did not listen to Mahler. (*Id*.) Another patron in the restaurant intervened and told Chen that Mahler was correct as to the law and that what she was doing was illegal and wrong. Chen did not listen to the patron. (*Id*. ¶ 17.) Mahler and Guliet left the restaurant.

Mahler was extremely embarrassed and distressed by his experience at Mizumi Buffet. (*Id.* ¶ 15.) Mahler found it "severely emotionally distressing to be singled out in a public place . . . and be told loudly that [he] was unwelcome and needed to leave because [he is] disabled." (*Id.*)

Defendants dispute that Chen or anyone told Mahler "no dog" and asked him to leave Mizumi Buffet. Defendants submit the affidavit of Chen in which she attests to the following: Chen is an owner/operator of Mizumi Buffet and was working at the restaurant on the date of the alleged incident. (Aff. of Lucy Chen (Chen Aff.) ¶ 1, ECF No. 43.) Chen is familiar with Mahler and has known him as a "regular" of Mizumi Buffet over the past six years or so, which is how

Page 4 – FINDINGS AND RECOMMENDATION
*Mahler v. Steady Stream*, 3:23-cv-01833-AR

long Chen has worked at the restaurant. At times, Mahler visited Mizumi Buffet as many as two to three times a month. Every time Mahler came to the restaurant, he was treated well and in a friendly and respectful fashion; staff members know exactly which table Mahler prefers and what drink he likes to order. (*Id.* ¶ 2.)

For most of Mahler's visits to Mizumi Buffet he has brought the same dog with him; the dog wears a collar with a leash attached and usually sits under or near the table where Mahler eats. The dog usually walks behind Mahler and does not lead him anywhere. The dog does not wear any vest or other signifying emblem, badge, or device indicating it is anything other than Mahler's pet; and nothing about the animal indicates it is specially trained. Over the course of the six years that Mahler has visited Mizumi Buffet with his dog, he has never mentioned to Chen or any staff member that the dog is a service or assistance dog. (*Id.* ¶ 3.)

On March 4, 2022, Mahler arrived at Mizumi Buffet around 2:00 p.m. while Chen was helping another customer. Before Chen had a chance to greet Mahler like she normally does, he walked straight to the hot food counter with his dog to get food. As Mahler was serving himself food from the buffet, another customer noticed Mahler's his dog standing with its head up, leaning directly on the buffet counter, sniffing a tray of spring rolls. The concerned customer informed restaurant staff. One of the staff members told Mahler that a customer had said that his dog was too close to the food. A different customer then approached Chen and noted that the dog's head was still on the buffet counter. When Chen turned around, she saw that the dog's head was indeed on the food counter, right where the food was. (*Id.* ¶¶ 4-8.)

Chen immediately walked over to Mahler and politely said to him that his dog was too close to the food, and that some other customers had complained. Chen asked Mahler to please

keep his dog under the table like he had usually done in the past. Mahler gave no verbal response to Chen and simply took his dog back to his seat. Chen arranged to have the chef to throw away all six trays of food and remake them, for the health and safety of other customers. (*Id.* ¶¶ 8-10.)

Rather than sit down to eat, Mahler next walked over to the sushi counter with his dog. As he passed by Chen, she offered to hold his dog while he got some sushi. Mahler ignored Chen completely, failing to even make eye contact, and mumbled something under his breath as he walked away, which Chen could not make out. The customers at tables B4, B5, and B6 overheard Mahler and appeared to have said something to him, although Chen could not understand what was said. Soon after, Mahler was speaking loudly with the customer at table B5. Just as the situation was escalating, Chen heard the phone ring and hurried to the front to answer it. The argument between Mahler and the other customer seemed to quiet down after that. (*Id.* ¶¶ 10-11.)

Mahler was visibly upset and left the restaurant a short time later, after stopping briefly to chat with the customer at table C2 for about five minutes. Throughout Mahler's entire visit, he never looked at Chen or spoke to her, even when Chen spoke directly to him. (*Id.* ¶ 11.)

Over the course of six years that Mahler has visited Mizumi Buffet with his dog, including on March 4, 2022, Chen was unaware of the dog as a service animal. She did not see Mahler's dog perform work or any tasks related to physical disabilities and did not see any sign that the dog had been specially trained to assist Mahler with any disability. (*Id.* ¶¶ 14-16.)

As a business owner, Chen especially welcomes returning customers like Mahler. She never ordered Mahler to leave the restaurant or to take his dog out of the restaurant. To the contrary, Chen encouraged Mahler to stay and enjoy his meal with his dog and simply asked him,

for health and hygiene reasons, to refrain from allowing his dog to attempt to get food from the buffet. (*Id.* ¶ 12.)

## LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party seeking summary judgment bears the burden of establishing the absence of a genuine issue of material fact. *Celotex v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party demonstrates that no issue of material fact exists, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id.* at 324. A party cannot defeat a summary judgment motion by relying on the allegations set forth in the complaint, on unsupported conjecture, or on conclusory statements. *Hernandez v. Spacelabs Med., Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Summary judgment thus should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

In determining whether to grant summary judgment, the court must view the evidence in the light most favorable to the nonmoving party—here, Mahler. *Curley v. City of North Las Vegas*, 772 F.3d 629, 631 (9th Cir. 2014); *Hernandez*, 343 F.3d at 1112. All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). But deference to the nonmoving party has limits. The nonmoving party must set forth "specific facts showing a genuine issue for trial." FED R. CIV. P. 56(e). The "mere existence of a scintilla of evidence in support of the plaintiff's position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986); *Chong v. STL Int'l, Inc.*,

152 F. Supp. 3d 1305, 1309 (D. Or. 2016). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotation marks omitted).

## DISCUSSION

A.    ***Negligence (Claim 1)***

Under Oregon law, "'[a] negligence complaint, to survive a motion to dismiss, must allege facts from which a factfinder could determine (1) that defendant's conduct caused a foreseeable risk of harm, (2) that the risk is to an interest of a kind that the law protects against negligent invasion, (3) that defendant's conduct was unreasonable in light of the risk, (4) that the conduct was a cause of plaintiff's harm, and (5) that plaintiff was within the class of persons and plaintiff's injury was within the general type of potential incidents and injuries that made defendant's conduct negligent.'" *Moody v. Oregon*, 371 Or. 772, 784 (2023) (quoting *Solberg v. Johnson*, 306 Or. 484, 490-91 (1988)).

Generally, a plaintiff who seeks damages for emotional harm—like Mahler in this case—may do so only where the harm is tied to a physical injury. *See Tomlinson v. Metro. Pediatrics, LLC*, 275 Or. App. 658, 679 (2015), *aff'd*, 362 Or. 431 (2018). Still, a plaintiff may recover damages based on emotional injury alone when a defendant acts intentionally or "infringes some other legally protected interest." *Philibert v. Kluser*, 360 Or. 698, 702, 704 (2016) ("In the context of emotional distress, a legally protected interest is an independent basis of liability separate from the general duty to avoid foreseeable risk of harm." (citation modified)). The right to recover in such instances does not arise from every infringement of a legally protected

interest; only from those that are "of sufficient importance as a matter of public policy to merit protection from emotional impact." *Id.* at 705. Sources from which Oregon courts have found legally protected interests include court orders, statutes, and the common law. *See, e.g., id.* (holding that "[the] plaintiffs have alleged the violation of a legally protected common law interest to be free from the kind of emotional distress injury caused by [the] defendant's negligence here"); *see also, Nearing v. Weaver,* 295 Or. 702,707 (1983) (holding that the plaintiffs sufficiently alleged the violation of "a specific duty imposed by statute[, the Abuse Prevention Act,]" and therefore reversing the lower court's "incorrect" finding that the plaintiff could not recover for "psychic and emotional injuries"); *McEvoy v. Helikson*, 277 Or. 781, 789 (1977) (holding that the plaintiff had a "legal right" to the custody of his child that had been established by court order and that the "conduct by defendant which resulted in an infringement of that legal right, if established by evidence at trial, would entitle plaintiff to recover damages for anguish and mental suffering") (citation modified), *superseded by rule on other grounds as recognized in*, *Moore v. Willis*, 307 Or. 254, 258 (1988).

The court is unpersuaded by defendants' argument that, even if Mahler's version of events is true, his negligence claim fails because "[he] cannot prove the violation of a legally protected interest" sufficient to support his claim for emotional damages. (MSJ at 14.) But a plaintiff may recover damages for the kind of mental suffering that Mahler alleges where the alleged wrongdoing infringes on a legally protected interest, such as those protected by the ADA. *See Nearing,* 295 Or. at 707 (plaintiff could recover for "psychic and emotional injuries" where negligence claim alleged, and evidence showed, the violation of "a specific duty imposed by statute[, the Abuse Prevention Act]"). Indeed, the purpose of the ADA is to prevent places of

public accommodation, including restaurants, from discriminating against someone because of their disability because "such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." 42 U.S.C. § 12101(a)(2). Mahler's legally protected interest in having his disabilities accommodated is of sufficient public importance to support his negligence claim for purely emotional harm. *See Nearing*, 295 Or. at 707. Accordingly, Mahler's negligence claim against Chen survives summary judgment.

Mizumi Buffet and Steady Stream[2] assert that they cannot be held liable for Chen's alleged conduct. Yet under Oregon law, an employer "may be held liable for the tortious acts of its employees . . . under the doctrine of *respondeat superior* when the employee acts within the course and scope of his or her employment." *McLean v. Pine Eagle Sch. Dist., No. 61*, 194 F. Supp. 3d 1102, 1123 (D. Or. 2016) (citing *Minnis v. Or. Mut. Ins. Co.*, 334 Or. 191, 201 (2002)). "An employee acts within the course and scope of his or her employment when three requirements are satisfied: (1) the act occurs substantially within the time and space limits authorized by the employment; (2) the employee was motivated, at least in part, by a purpose to serve and benefit the employer; and (3) the act is of a kind that the employee was hired to perform." *Id.* "Whether an employee has acted within the scope of employment at any given time generally is a question for the trier of fact, except in cases where only one reasonable conclusion may be drawn from the facts pled." *Id.* (citing *Fearing v. Bucher*, 328 Or. 367, 374 (1999)).

Here, only one reasonable conclusion may be drawn from the record: Chen was acting within the scope of her employment when she interacted with Mahler at Mizumi Buffet on

---

[2]     Because Mizumi Buffet is an assumed business name it is not a separate entity. When referring to Mizumi Buffet, the court means both Steady Stream, Inc. and Mizumi Buffet.

March 4, 2022. (*See* Chen Aff. ¶ 4.) Mizumi Buffet and Steady Stream are therefore not entitled to summary judgment on Mahler's negligence claim.

As to Ou, however, there is no evidence that he was aware of or participated in the alleged incident. Under Oregon law, the director of a corporation is not liable for the tort of an employee unless they "knew of those acts or participated in them." *Cortez v. Nacco Material Handling Group, Inc.*, 356 Or. 254, 269 (2014). Ou is therefore entitled to summary judgment on Mahler's negligence claim.

## B.    *Gross Negligence (Claim 2)*

Under Oregon law, "[a] plaintiff may establish gross negligence by showing that a defendant acted with indifference to the probable consequences of the defendant's actions." *Emerson v. Mt. Bachelor, Inc.*, 273 Or. App. 524, 527 (2015) (citing *Howard v. Chimps, Inc.*, 251 Or. App. 636, 647 (2012)). A defendant has acted with indifference to the probable consequences of an act if the "circumstances proclaimed danger and warned the defendant of the impending disaster." *Id.* (citing *Rauch v. Stecklein,* 142 Or. 286, 292 (1933) (citation modified)). "[G]ross negligence differs from ordinary negligence because 'the injury that the defendant inflicts is not entirely inadvertent' and, 'therefore, differs from those of another who is guilty of only ordinary negligence.'" *Id.* (citing *Rauch*, 142 Or. at 293-94 (citation modified)). That said, "[i]t is unnecessary that the warning of disaster should be express. If the circumstances are such that the defendant, in exercise of slight diligence, should have observed the impending danger, he becomes charged with knowledge of all that the circumstances impart." *Id.* (citing *Rauch*, 142 Or. at 293 (citation modified)).

Here, defendants argue that Mahler's gross negligence claim cannot survive summary judgment because "[n]o circumstances proclaimed danger at all" and "no circumstances warned . . . defendant of any impending disaster[.]" (MSJ at 18.) The court disagrees. Mahler states in his affidavit that, after Chen asked him and Guliet to leave, he "tried to explain to [Chen] what the law was . . . and that she was required to allow [me and Guliet] to stay and eat" (Mahler Aff. ¶ 14); he also states that "another patron . . . felt the need to step in to intervene on [his] behalf, telling [Chen] that [Mahler] was correct as to the law and that what she was doing was illegal and wrong." (*Id*. ¶ 17). Given that evidence, a reasonable jury could find that the circumstances "proclaimed danger" and warned Chen that denying restaurant service to Mahler because of his service animal would cause him significant emotional harm. Chen is therefore not entitled to summary judgment on Mahler's claim for gross negligence. Based on the principles of *respondeat superior*, Mizumi Buffet and Steady Stream are also not entitled to summary judgment on Mahler's claim for gross negligence. *See McLean*, 194 F. Supp. 3d at 1123.

Ou is entitled to summary judgment on Mahler's gross negligence claim because no evidence indicates that he knew of or participated in the alleged incident. *See Cortez*, 356 Or. at 269.

### D.    *Violations of the ADA (Claims 3 and 4)*

Mahler brings Claims 3 and 4 under Titles II and III of the ADA. Claim 3 is a generalized discrimination claim, while Claim 4 alleges failure to accommodate. (Compl. ¶¶ 26-36.) In bringing a claim for relief under the ADA, a plaintiff can allege "disparate treatment" from similarly situated individuals, a lack of affirmative reasonable accommodation, or both. *McGary v. City of Portland*, 386 F.3d 1259, 1266 (9th Cir. 2004). The ADA protects against

Page 12 – FINDINGS AND RECOMMENDATION
*Mahler v. Steady Stream*, 3:23-cv-01833-AR

discrimination and establishes an affirmative duty in some situations to use a heightened

standard of care in providing services and accommodations. *Dunlap v. Ass'n of Bay Area Gov'ts,*

*996 F. Supp. 962, 965 (N.D. Cal. 1998).* Mahler does not allege that he was treated differently

from other customers or that Mizumi Buffet has a facially discriminatory policy. Rather, he

alleges that defendants failed to accommodate his use of a service animal. (Compl. ¶¶ 26-36.)

Mahler's general discrimination claim under the ADA (Claim 3) should therefore be dismissed.[3]

To prevail on his other ADA claim under Title III of the ADA, 42 U.S.C. §§ 12182(a)-(b),

Mahler must show that (1) he is disabled under the ADA; (2) defendants own, lease, or operate a

place of public accommodation; and (3) he was denied public accommodation, *i.e.*, service, by

defendants because of his disability. *Molski v. M.J. Cable, Inc.*, 481 F.3d 724, 730 (2007) (citing

42 U.S.C. § 12181(a)-(b)).

Here, defendants do not dispute that Mahler is disabled under the ADA or that Mizumi

Buffet is a place of public accommodation. Rather, defendants argue that, even if Mahler could

show that Chen asked him to leave because of his dog, he cannot show any discriminatory

---

[3]      Mahler's general discrimination claim should be dismissed for the additional reason that
Title II of the ADA addresses public entities (state and local government and their agencies), and
Mizumi Buffet is not a public entity. *See* 42 U.S.C. § 12132 ("no qualified individual with a
disability shall, by reason of such disability, be excluded from participation in or be denied the
benefits of the services, programs, or activities of a public entity, or be subjected to
discrimination by a public entity"); *id.* § 12131(1) (defining public entity as "any State or local
government" and their departments or agencies); *see also* *PGA Tour, Inc. v. Martin*, 532 U.S.
661, 675 (2001) ("To effectuate its sweeping purpose, the ADA forbids discrimination against
disabled individuals in major areas of public life, among them employment (Title I of the Act, 42
U.S.C. §§ 12111–12117), public services (Title II, §§ 12131–12165), and public
accommodations (Title III, §§ 12181–12189)") (footnotes omitted, citations added).

animus because there is no evidence that Guliet is an ADA service animal or that Chen should have been aware of Guliet as an ADA service animal. (MSJ at 20-22.) Chen states in her affidavit that Mahler had visited Mizumi Buffet on previous occasions with his dog and that "[n]othing about the animal indicates in any manner that it is specially trained nor does it wear any vest or other signifying emblem, badge, or device indicating it is anything other than a person's pet[.]" (Chen Aff. ¶ 3.)

But defendants advance qualifications for a service animal not required by the ADA. That is, the ADA "prohibits certification requirements for qualifying service dogs[.]" *C.L. v. Del Amo Hospital, Inc.*, 992 F.3d 901, 910 (9th Cir. 2021) (explaining that such certification is prohibited because, "(1) the ADA defines a service dog functionally, without reference to specific training requirements, (2) Department of Justice ('DOJ') regulations, rulemaking commentary, and guidance have consistently rejected a formal certification requirement, and (3) allowing a person with a disability to self-train a service animal furthers the stated goals of the ADA, for other training could be prohibitively expensive"). Although "a service animal within the meaning of the ADA must be individually trained to perform tasks related to an individual's disability" and "[t]here must be some evidence of individual training to distinguish the service animal from an ordinary pet[,]" *id.* at 911, "the animal need not be formally certified." *Id.* The "test is a functional one [that asks]: can the dog consistently help the person with a disability meet the challenges of life by assisting in the person's activities of daily living?" *Id.*

Here, as defendants point out, there is no evidence that Guliet has ever received formal training as a service animal. (MSJ at 21.) Mahler contends, however, that "[he] has used a service dog to help mitigate the effects of his disabilities since the mid-1980s, and has always

Page 14 – FINDINGS AND RECOMMENDATION
*Mahler v. Steady Stream*, 3:23-cv-01833-AR

trained his service dogs himself." (Resp. at **.) Mahler also states in his affidavit that he "trained Guliet in . . . retrieving objects and handing them to [him] so [he] did not have to bend down." (Mahler Aff. ¶ 5.) Based on that evidence, a reasonable jury could find that Guliet has been trained to mitigate the symptoms of Mahler's disability and therefore qualifies as a service animal under the ADA. *See Del Amo Hospital, Inc.*, 992 F.3d at 910.

Because there is no dispute that Mahler is disabled or that Mizumi Buffet is a public accommodation, and because a reasonable jury could find that Guliet is an ADA service animal and that Chen asked Mahler to leave because of Guliet, Chen is not entitled to summary judgment on Mahler's ADA failure to accommodate claim. Under the principle of *respondeat superior*, Mizumi Buffet and Steady Stream are also not entitled to summary judgment on Mahler's ADA failure to accommodate claim. *See McLean*, 194 F. Supp. 3d at 1123.

Ou is entitled to summary judgment on Mahler's ADA failure to accommodate claim because no evidence suggests that he knew of or participated in the alleged incident. *See Cortez*, 356 Or. at 269.

**D.** *Intentional Infliction of Emotional Distress (Claim 5)*

An IIED claim requires a plaintiff to prove three elements: "(1) that defendants intended to cause plaintiff severe emotional distress or knew with substantial certainty that their conduct would cause such distress; (2) that defendants engaged in outrageous conduct, *i.e.*, conduct extraordinarily beyond the bounds of socially tolerable behavior; and (3) that defendants' conduct in fact caused plaintiff severe emotional distress." *House v. Hicks*, 218 Or. App. 348, 357-58 (2008) (citing *McGanty v. Staudenraus*, 321 Or. 532, 543 (1995)). "Whether conduct is an extraordinary transgression is a fact-specific inquiry to be considered on a case-by-case basis,

Page 15 – FINDINGS AND RECOMMENDATION
*Mahler v. Steady Stream*, 3:23-cv-01833-AR

based on the totality of the circumstances." *Id.* at 358. Whether the offensiveness of the conduct "exceeds any reasonable limit of social toleration" is "a judgment of social standards rather than of specific occurrences." *Id.* at 358-59 (quoting *Hall v. The May Dept. Stores*, 292 Or. 131, 137 (1981), *overruled in part on other grounds by McGanty*, 321 Or. at 548). The trial court performs a gatekeeping role in determining in the first instance whether a defendant's conduct is sufficiently outrageous or extreme—that is, whether it "goes beyond the farthest reaches of socially tolerable behavior and creates a jury question on liability." *Id.* at 358 (citing *Tenold v. Weyerhaeuser Co.,* 127 Or. App. 511, 517 (1994), *rev. dismissed,* 321 Or. 561 (1995), and *Pakos v. Clark*, 253 Or. 113, 132 (1969)).

Oregon appellate courts have identified "contextual factors that guide . . . classification of conduct as extreme and outrageous." *Id.* at 360. For instance, "the illegality of conduct is relevant to, but not determinative of, whether the conduct is sufficiently outrageous to support an IIED claim." *Id.* at 359. Other factors include "whether the conduct was undertaken with an ulterior motive or to take advantage of an unusually vulnerable individual." *Id.* at 360 (citing *Checkly v. Boyd*, 170 Or. App. 721 (2000)). "[W]hether [the conduct] occurred in a public venue or in an employment context, also bears on the degree of its offensiveness." *Id.* (citing *Hall*, 292 Or. at 137). "The most important factor is whether a special relationship exists between a plaintiff and a defendant, such as an employer-employee, physician-patient, counselor-client, landlord-tenant, debtor-creditor or government officer-citizen, that shapes the interpersonal dynamics of the parties." *Id.* In considering whether a "special relationship" exists between the parties, the question is whether the defendant's relationship to the plaintiff is one that "imposes on the defendant a greater obligation to refrain from subjecting the [plaintiff] to abuse, fright, or

shock than would be true in arm's-length encounters among strangers." *Id.* (quoting *McGanty, 321 Or. at 547-48*).

Here, some factors support the determination that the conduct alleged by Mahler should be considered by a jury as to whether it was outrageous or extreme conduct. For one, the conduct occurred in a public place, which resulted in Mahler's "extreme embarrassment" when told to leave. For another, the court has concluded that Chen and Mizumi Buffet are not entitled to summary judgment on Mahler's ADA failure to accommodate claim, which potentially makes the conduct illegal. Yet nothing in the record reflects an ulterior motive for Chen. And although Mahler's disability may make him more vulnerable than someone without a physical disability, no evidence shows that suggests that Chen was taking advantage of that vulnerability. Nor is there a special relationship between Mizumi Buffet (or Chen) and Mahler. The court is unaware of any Oregon appellate decisions that have concluded that a special relationship exists between a public-facing business like Mizumi Buffet and its customers. This court cannot conclude itself that the nature of the relationship between a restaurant and its patrons "shapes the interpersonal dynamic" between them.[4] Given those latter reasons, the court concludes that the conduct, even

---

[4]     This is not to say that actions by a proprietor couldn't change the nature of the relationship by, for example, the proprietor involving the police or physically removing a patron. That is, some action that removes the relationship from a transaction that is ordinarily arm's length.

Page 17 – FINDINGS AND RECOMMENDATION
*Mahler v. Steady Stream*, 3:23-cv-01833-AR

if Mahler's version of events is credited as true, does not go beyond the "farthest reaches of socially tolerable behavior."[5]

In sum, defendants are entitled to summary judgment on Mahler's IIED claim. Although a reasonable jury could agree with Mahler and find that he was asked to leave Chen's restaurant in the manner that he alleges, it couldn't find that the conduct was "sufficiently extreme and outrageous to result in liability." *Hicks*, 218 Or. App. at 358 (quoting Restatement (Second) of Torts § 46 comment h (1965)).[6]

### E.    *Doe Defendants*

Mahler names Does 1-10 as defendants in the complaint. When a plaintiff filing a complaint does not know the names of one or more defendants, courts may allow them an

---

[5]    The court need not reach defendants' argument that, even if Chen's alleged conduct was sufficiently outrageous to support a claim for IIED, there is still no evidence of intent. (MSJ at 26.)

[6]    After briefing on defendants' motion for summary judgment had closed, defendants supplemented their reply (ECF No. 51) in violation of Local Rule 7-1(f), which provides that "[u]nless directed by the Court, no further briefing is allowed" on a motion for summary judgment after a response and reply have been filed. *See also* LR 56-1.

Defendants apparently believed it was proper to submit a supplemental brief because, they say, Mahler "finally" provided responses to outstanding discovery requests on the last day of the discovery period, which was after defendants' reply was due and filed. (*See* ECF No. 51 at 2.) But it was defendants who chose to move for summary judgment two months before the end of fact discovery. (*See* ECF Nos. 36, 41.) Indeed, the court inquired at the December 10, 2024, status conference whether an extended briefing schedule on that motion would be necessary given that all briefing would be due before the end of discovery. (*See* ECF No. 45.) Defense counsel indicated that no extensions were necessary. (*Id.*)

Accordingly, the court declines to address defendants' supplemental brief. In any case, consideration of that brief would not alter the court's conclusions.

opportunity in discovery to ascertain and identify the unknown defendants. *Gillespie v. Civiletti*, 629 F.2d 637 (9th Cir. 1980), *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 n.13 (1978). At the close of discovery, those defendants may be dismissed if the plaintiff fails to amend the complaint to allege injury against newly named defendants. *Id.*

 Here, fact discovery closed on January 17, 2025 (ECF No. 45), and Mahler has not sought leave to file an amended complaint to add the names of the Doe defendants. The court therefore dismisses Does 1-10 from this case without prejudice. *See Bratcher v. Polk County*, No. 3:20-CV-02056-SB, 2022 WL 17184419, at *5 (D. Or. Sept. 1, 2022), *findings and recommendation adopted*, 2022 WL 17178266 (D. Or. Nov. 23, 2022) (granting summary judgment as to claims brought again Doe defendants when they had not been identified or substituted at the end of discovery); *see also*, *Ouma v. Clackamas County*, No. 3:12-cv-01465-HZ, 2014 WL 1874051, at *2 (D. Or. May 7, 2014) (dismissing claims against the Doe defendants when the plaintiff had "over a year since the filing of the case" to identify the Doe defendants but had not done so and finding that the "use of John Doe is disfavored, but allowed through the end of discovery").

## CONCLUSION

 For the above reasons, defendants' motion for summary judgment (ECF No. 41) should be GRANTED as to all claims against Ou, GRANTED as to the ADA discrimination claim against all defendants (Claim 3) and the IIED claim (Claim 5), and DENIED as to the claims for negligence (Claim 1), gross negligence (Claim 2), and ADA failure to accommodate (Claim 4) against Chen, Mizumi Buffet, and Steady Stream.

**SCHEDULING ORDER**

The Findings and Recommendation will be referred to a district judge. Objections, if any, are due within 14 days. If no objections are filed, the Findings and Recommendation will go under advisement on that date. If objections are filed, a response is due within 14 days. When the response is due or filed, whichever date is earlier, the Findings and Recommendation will go under advisement.

DATED: September 22, 2025.

_____
JEFF ARMISTEAD
United States Magistrate Judge